UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————————

CONSTELLATION BRANDS, INC.,

                              Plaintiff

-vs-

ARBOR HILL ASSOCIATES, INC.,

                              Defendant

———————————————————————————

ARBOR HILL ASSOCIATES, INC., et al.,

                              Third-Party Plaintiffs

-vs-

NIXON PEABODY LLP, f/k/a NIXON
HARGRAVE DEVANS & DOYLE LLP,

                              Third-Party Defendant

———————————————————————————

NIXON PEABODY LLP, f/k/a NIXON
HARGRAVE DEVANS & DOYLE LLP,

                              Fourth-Party Plaintiff

-vs-

HARTER, SECREST & EMERY LLP, BRIAN
SHAW, and STEPHEN B. SALAI,

                              Fourth-Party Defendants.

———————————————————————————

DECISION AND ORDER

02-CV-6498 CJS

APPEARANCES

For plaintiff Constellation
Brands, Inc.:                          Allen J. Baden, Esq.
                                       Susan A. Smith, Esq.
                                       Kenyon & Kenyon
                                       One Broadway

1

New York, New York 10004-1050

Paul V. Nunes, Esq.
Underberg & Kessler LLP
300 Bausch & Lomb Place
Rochester, New York 14604

For defendant Arbor Hill Associates,
Inc. and third-party plaintiffs Arbor
Hill Associates, Inc., John H. Brahm,
and Katharine Brahm:               A. Paul Britton, Esq.
                                   Kenneth Payment, Esq.
                                   Harter, Secrest and Emery, LLP
                                   1600 Bausch & Lomb Place
                                   Rochester, New York 14604-2711

## INTRODUCTION

This is an action between two wine producers involving, *inter alia*, claims of trademark infringement.  Now before the Court are the following motions: 1) a motion to dismiss and for summary judgment [#115] by defendant-third-party plaintiff Arbor Hill Associates ("AHA")[1]; and 2) a cross-motion for summary judgment [#117] by plaintiff Constellation Brands, Inc. ("Constellation.").  For the reasons that follow, AHA's motion is granted in part and denied in part, and Constellation's motion is denied.

## BACKGROUND

This action primarily involves a dispute between Constellation and AHA over the use of three federally-registered wine trademarks containing the word "arbor."[2]  Specifically, AHA owns the trademark "Arbor Hill", while Constellation owns the marks "Arbor Valley"

---

[1] The Court will refer to Arbor Hill Associates, Inc., John H. Brahm and Katharine Brahm collectively as "AHA."

[2] This also involves a state-law dispute between AHA and the law firm of Nixon Peabody LLP ("Nixon Peabody"), arising from Nixon Peabody's prior representation of AHA in connection with the Arbor Hill trademark.

and "Arbor Mist."  Unless otherwise indicated, the following are the undisputed facts of the case.

In or about 1964, AHA's owners, John Brahm and Katharine Brahm, purchased a farm in Naples, New York, which they named the Arbor Hill Vineyard.  Between 1966 and 1986, the Brahms leased the Arbor Hill Vineyard to the Widmer Winery ("Widmer"), of which John Brahm was an employee and part-owner.  In or about 1986, Constellation[3] purchased Widmer and, a short time later, terminated John Brahm's employment. (Brahm Affidavit ¶ 7).  Subsequently, the Brahms decided to go into business for themselves, and formed AHA for that purpose.  In early 1987, AHA selected the name "Arbor Hill" for a line of gourmet wine-based food products, which it intended to produce and sell.  AHA federally registered the Arbor Hill trademark for food products, but on the advice of counsel, did not register the name for wine.  In or about September 1987, AHA opened a retail shop in Bristol Springs, New York,  named the Arbor Hill Grapery, from which it began selling Arbor Hill food products, such as wine sauces, jellies, and vinegars.  At all relevant times, The Arbor Hill Grapery was located within a few miles of Constellation's facilities in Ontario County, New York, and according to AHA, during the relevant time some of Constellation's management personnel passed by Arbor Hill's facilities and signs on a daily basis.

In 1987, Constellation, which already produced a large variety of wines under different names, began selling grape table wine under the federally registered trademark Arbor Valley.  Constellation's Arbor Valley wine was produced and shipped from Batavia,

---

[3]Widmer was actually purchased by Canandaigua Wine Company, which later changed its name to Constellation.  However, for the sake of simplicity, the Court will refer to Canandaigua Wine Company herein as Constellation.

New York, primarily to distributors outside of New York State, although it was eventually sold to some distributors in New York.  Specifically, between 1987 and February 1990, Constellation sold Arbor Valley wine exclusively to a distributor in Stratford, Connecticut. The earliest that Constellation sold Arbor Valley wine to customers located in New York State was February 1990, when it sold 144 cases to a customer in Deer Park, Long Island. (Roberts Declaration, Exhibit A).  Constellation's first sale of Arbor Valley to a customer in upstate New York was in 1991, when it sold six cases to a customer in Batavia. (*Id*.). However, AHA maintains that it never heard of Constellation's Arbor Valley mark until 2001.  In that regard, AHA never observed any Arbor Valley wine being sold in Western New York.  Moreover, although AHA's attorneys conducted a trademark search in 1987 in connection with the federal registration of the Arbor Hill mark for food products, the search did not reveal Constellation's use of the name Arbor Valley.

In or about August 1988, AHA began selling grape table wine under the brand name "Finger Lakes Lake Boat" ("Lake Boat"), with the label stating that the wine was "made and bottled by Arbor Hill Grapery."  Sometime prior to June 1989, AHA also began selling wine under the brand name "Arbor Hill." (Brahm Reply Decl. Exhibit BBB).  Since then, AHA has sold Arbor Hill wine from the Arbor Hill Grapery and other local outlets, including liquor stores, restaurants and  two retail wine stores owned by Constellation. (Brahm Affidavit ¶ 31).  AHA indicates that sales of Arbor Hill wines have been "modest," but that the trademark has nevertheless "become a familiar part of the retail wine landscape in the Finger Lakes region and in western New York." (*Id*. at ¶ 30)  In that regard, between 1993 and 2004, AHA's annual gross revenues for the sale of Arbor Hill products ranged between

$200,000 and $550,000. (Smith Declaration, Exhibit 19).  During that same period, AHA spent between $10,000 and $30,000 per year advertising Arbor Hill products. (*Id.*, Exhibit 18).  More recently, between 1994 and 2004, AHA spent approximately $30,000 per year on such advertising. (*Id.*).  AHA also has "more than 15,000 customers visit [the Arbor Hill Grapery] for wine tasting" annually. (Brahm Reply Affidavit, ¶ 22).

Constellation indicates that it does not know when if first became aware of "the Arbor Hill Grapery." (Kane Declaration, Exhibit 11, p. 55).  However, AHA contends that Constellation has been aware of AHA's use of the Arbor Hill mark for wine since about 1988.  In that regard, John Brahm, who was previously employed by Constellation[4], told various Constellation management personnel that he was starting a business using the Arbor Hill name. (Brahm Affidavit ¶ 31(a)).  Subsequently, AHA purchased some of its wine-making ingredients directly from Constellation. (*Id.* at ¶ 31(d)).  AHA also points to the close geographic proximity between the Arbor Hill Grapery and Constellation's facilities in Ontario County, New York, as well as the fact that Arbor Hill wine was being sold from the Arbor Hill Grapery and other outlets in the area, including two retail wine stores owned by Constellation. (*Id.* at ¶ 31(b)&(c)).  Additionally, AHA indicates that Marvin Sands, the former chairman and founder of Constellation, received a bottle of Arbor Hill wine in 1991, and later complimented John Brahm on the wine . (*Id.* at ¶ 31(e)).  And finally, Arbor Hill wines received media coverage during the relevant time. (*Id.* at ¶ 31(f)).

Moving to the crux of the instant case, in 1998, Constellation began selling a new wine beverage under the name Arbor Mist.  Arbor Mist is a product consisting of wine

---

[4]*See* footnote 2.

mixed with fruit juice. (Encherman Affidavit ¶ 20) ("The concept evolved into a 'wine with fruit' beverage wine product- a great tasting, low-alcohol wine with a splash of fruit and other sweeteners."). Constellation developed Arbor Mist to appeal to consumers who did not like traditional wine. (Encherman Affidavit ¶ 19) ("Constellation learned that many consumers did not like table wines because they were too dry, and that these consumers also were unsatisfied with the few low-alcohol sweet wines in the marketplace . . . because of the perceived social stigma."). Constellation first decided that it would sell the as-yet-unnamed product in a distinctive frosted bottle, which it believed would make "the product seem cold, refreshing, and classy." (*Id*., ¶ 20). The Arbor Mist name was later selected by Constellation marketing employee William R. Encherman ("Encherman"). (Fondiller Dep. at 82). Encherman indicates that, when he was attempting to name the new product, his wife suggested the partial name "_____ Mist." (Encherman Affidavit ¶ 23). Encherman liked the word "mist," "because it conjured up the frosted bottle and the cold refreshment of the drink." (*Id*.). Subsequently, while Encherman and his colleague Rob Vlosky ("Vlosky") were brainstorming possible names to go with the word "mist," they looked through a book and came upon the name "Arbor Low," "which is a location in the Peak District of England, near Derbyshire." (*Id*. at ¶ 27 & Exhibit I). Encherman and Vlosky liked the word "arbor," because to them, "it was synonymous with grapes and wine, but did not sound too fruity." (*Id*.). At the time they selected the name Arbor Mist, neither Encherman nor Vlosky was aware of AHA's Arbor Hill wine. (*Id*. at ¶ 31).

    With regard to the alleged connection between the word "arbor" and wine making, Constellation states that

> a grape arbor is a generic term for a place where grapes are grown. . . .
> Arbors are commonly used in the merchandising of wine – our company and
> our competitors often provide arbor displays (with or without grapes) for
> liquor stores and other retailers for use in their stores to display our wines.

(*Id*. at ¶ 45).   On the other hand, although AHA admits that the word "arbor" suggests

"vines," it maintains that "[a]n 'arbor' is not necessarily a 'grape arbor' or vineyard." (AHA

Memo of Law p. 3).   Nevertheless, in addition to Arbor Valley, Arbor Hill and Arbor Mist,

there are a number of other wines produced and sold in the U.S. that use the word "arbor"

as part of their trademark.   These wines include Arbor, Arbor Crest, Arbor Brook, Arbor

Knoll, Arbor Frost, Arbor Trails, Thornapple Arbor, Bel Arbors, Old Arbor, and California

Arbor. (Smith Declaration, Exhibits 9-12, 16; Encherman Affidavit, Exhibits C-I).

Constellation registered the name Arbor Mist as a federal trademark in 1998.   Prior

to adopting the Arbor Mist mark, Constellation had its trademark attorneys perform a

trademark search for the name "Arbor Mist," to see "whether [that name was] available for

use as a brand name." (Fondiller Dep. at 16, 18).   Constellation did not, however, have its

attorneys specifically render an opinion as to whether the name Arbor Mist would infringe

the Arbor Hill mark, though it was aware of the nearby Arbor Hill Grapery. (Fondiller Dep.

at 53-54, 60).

On or about January 13, 1999, AHA applied for trademark registration for the name

Arbor Hill for wine, which the Patent and Trademark Office ("PTO") granted on June 27,

2000, although as already mentioned, AHA had been using the Arbor Hill mark for wine

since at least 1989.

In or about April 2001, AHA approached Constellation, complaining that the Arbor

Mist mark infringed AHA's Arbor Hill mark.[5]   AHA provided Constellation with a draft complaint alleging trademark infringement, and suggested that the parties attempt to reach an out-of-court settlement.   Subsequently, AHA and Constellation had settlement negotiations for more than a year, during which time AHA agreed not to commence litigation without notice to Constellation.   AHA's counsel described that agreement as follows:

> At the request of [Constellation's attorney], I . . . agreed that Arbor Hill would not commence any litigation unless and until the discussions between the parties concluded unsuccessfully. Moreover, at our first substantive settlement discussion, at a meeting between counsel, [Constellation's attorney] specifically asked me for a commitment that Arbor Hill would not deem the negotiations failed and would not commence an action without giving him three days' prior notice (he advised me that Constellation would want to use the time to issue a press release).  I agreed.

(Payment Aff. ¶ 6) (citation and internal quotation marks omitted).  In September 2002, settlement negotiations between AHA and Constellation were at "an apparent impasse," and AHA's counsel told Constellation's counsel that the impasse "would probably mean litigation," although he wanted to consult with AHA before doing anything. (*Id*. at ¶ ¶ 7-9). On the day following that conversation, October 1, 2002, Constellation commenced the subject action.

In its complaint, Constellation seeks, as its first claim, a declaratory judgment that there is no likelihood of confusion between the  Arbor Mist and Arbor Hill marks, and that the Arbor Mist mark does not, therefore, infringe the Arbor Hill mark.  Alternatively, as a second claim, Constellation requests that, if the Court finds that a likelihood of confusion

---

[5]AHA became aware of Constellation's use of the name Arbor Mist as soon as the product was introduced in 1988.

exists, that the Court further find that the Arbor Hill mark infringes Constellation's Arbor Valley mark.   In other words, Constellation alleges that its Arbor Mist mark does not infringe AHA's Arbor Hill mark, but that if it does, then AHA's Arbor Hill mark must necessarily infringe Constellation's Arbor Valley mark, which was in use first.

Arbor Hill answered the complaint and asserted counterclaims for trademark infringement, unfair competition, and false advertising under the Lanham Act and New York State law.   In that regard, AHA alleges, for example, that Arbor Mist is "sold for as little as $1.99 per bottle and is not considered a high-quality wine by the wine community." (Amended Answer with Counterclaims ¶ 63).   In fact, AHA contends that Arbor Mist is not truly  "wine," since its alcohol content is too low. (*Id*. at ¶ ¶ 63, 110).   On the other hand, AHA contends that its wines have "won numerous awards in wine competitions and have grown steadily in both reputation and popularity over the years." (*Id*. at ¶ 59).

On November 12, 2004, while this action was pending, Constellation's patent attorney, Stephen Baker ("Baker"), whose offices were located in New Jersey, and who knew nothing about the instant litigation, notified Constellation that it was time to file a "combined Section 8 and Section 15 affidavit" concerning the Arbor Mist mark with the PTO.   For purposes of this decision, it is sufficient to note that, in a combined Section 8 and Section 15 affidavit, the affiant must swear to two statements of fact: 1) that the mark has been in use for five years; and 2) that the mark has not been the subject of any legal dispute. *See*, 15 U.S.C. § 1065.   Baker indicates that since the Arbor Mist mark had been registered for five years, and since he was not aware of any legal dispute involving the mark, he recommended that Constellation file the affidavit, to provide evidence supporting

9

the mark's incontestability:

> A registration becomes incontestable as a matter of law on its fifth anniversary whether or not you file a declaration, assuming there's no litigation [involving the mark].  The Section 15 Affidavit doesn't render the registration incontestable, it's simply evidence that would support a claim of incontestability.

(Baker Deposition p. 37, 40).

Specifically, Baker contacted Constellation's Vice President and General Counsel, Ronald Fondiller ("Fondiller"), who was the individual at Constellation responsible for overseeing such trademark matters. (Fondiller Dep. at 9) ("I am the one that interacts with outside counsel on normal maintenance matters, whether trademarks [need] to be renewed or allowed to lapse or whatever may be needed.").  In an email, Baker advised Fondiller that a combined Section 8 and Section 15 affidavit should be filed, and Fondiller directed Baker to send the proposed affidavit to an individual at Constellation named Chris Benzinger ("Benzinger"), who would sign the affidavit. (Baker Dep. at  42).[6]  However, Baker advised Fondiller that no such signature was needed, since he could file the affidavit himself: "Mr. Fondiller [replied to my email], 'Please have Chris Benzinger sign.'  I replied, 'There is nothing that has to be signed.  I will photograph a bottle and file over my . . . signature unless you instruct to the contrary.'  Mr. Fondiller instructed me to file." (Baker Dep. at 42).   However, Fondiller indicates that when he directed Baker to file the declaration, he did not recall the specific contents of the form affidavit that would be used:

> Q. Did Constellation know of the content of the declaration you just referred to prior to its filing?

---

[6]The record indicates that, in addition to Fondiller, Baker would sometimes deal directly with Fondiller's assistants. (Baker Dep. at 22-23).

A. Constellation in this case would be me.  I did not recall the specific content of the [Section] 8 and 15 affidavit.

Q. You did – I'm not sure I understand your answer when you say "I did not recall."  You did not recall it at what time?

A. Really at any – at the time that I was informed that it was time to file one in connection with Arbor Mist.

Q. Did you give any instructions to Mr. Baker with regard to this declaration that we're talking about?

A. Yes.

Q. And those instructions were?

A. To file it.

Q. Did you have any discussions with Mr. – well, did you have any discussions with Mr. Baker as to the content of this declaration at the time that you gave the instruction to file it?

A. No.

(Fondiller Dep. at 79-80).

Prior to executing the affidavit, Baker obtained proof that the Arbor Mist mark was still in use, by purchasing a bottle of the product.  (Baker Dep. at 50).  Baker was also aware that the mark had been in continuous use, because he had seen the product in stores. (*Id*. at 51).  Additionally, Baker believed that the Arbor Mist mark was not the subject of litigation, because he was familiar with Constellation's trademark affairs as a result of having represented Constellation "since at least 1964." (Baker Dep. at 52-54, 59-61).

I have worked with Canandaigua [Wine Company] and its successors [Constellation] since at lest 1964.  I have litigated in Federal District Court . . . .  I have handled oppositions in the U.S. Patent Trademark Office.  I'm afraid I made an assumption that if there was anything going on, I would have known of it.  Since I did not know of it, I felt confident in saying that

[there was no litigation involving the mark.] That was clearly a mistake.

(Baker Dep at 53).[7]  Because of this incorrect assumption, Baker did not ask anyone at

Constellation whether there was any ongoing litigation involving the Arbor Mist mark. (*Id.*

at 54-55).  Nor did Baker submit the proposed affidavit to anyone at Constellation before

filing it with the PTO. (Fondiller Deposition pp. 78-81).  Consequently, Baker's sworn

affidavit incorrectly stated that there was "no proceeding involving said [Arbor Mist

trademark] rights pending and not disposed of either in the Patent and Trademark Office

or in the courts."  That statement was incorrect since the subject action was pending at the

time.

Constellation maintains that the erroneous filing was a mistake, but not fraud.

Nevertheless, upon learning that the affidavit had been filed, AHA accused Constellation

of attempting to defraud the PTO.  On or about January 14, 2005, Constellation voluntarily

withdrew the affidavit.   However, AHA amended its answer to assert a counterclaim,

alleging that the Court should cancel Constellation's Arbor Mist mark, as punishment for

Constellation's alleged attempt to defraud the PTO. In that regard, AHA maintains that

Fondiller "must have known" the contents of a Section 15 affidavit.  In support of that

accusation,  AHA indicates that during the years leading up to the filing of the incorrect

affidavit by Baker, during which Fondiller worked as an attorney for Constellation and was

responsible for the company's trademark matters, Constellation filed ten Section 15

---

[7]And more specifically, Baker had handled various matters involving the Arbor Mist mark during the preceding five years. (Baker Dep. at 60-61).

affidavits with the PTO, in connection with various trademarks. (Salai Reply Decl. ¶ ¶ 3-6).[8]

According to AHA, those filings suggest that Fondiller had "considerable experience with

Section 15 affidavits," and was "necessarily familiar with the averments that must be made

in a Section 15 incontestability affidavit, including the key averment that the trademark in

question is not the subject of litigation." (*Id*. at ¶ ¶ 5-6).

The parties subsequently conducted discovery on the issue of trademark

infringement.   On January 26, 2007, AHA filed the subject summary judgment motion

[#115], seeking three types of relief: 1) an Order dismissing Constellation's First Cause of

Action (for a declaratory judgment of non-infringement), on the grounds that Constellation

breached an agreement with Arbor Hill not to commence litigation while the parties were

exploring settlement;[9] 2) an Order granting summary judgment on Constellation's Second

Cause of Action (for trademark infringement), on the grounds of laches, and because there

is no infringement; and 3) an Order granting summary judgment on AHA's Eighth

Counterclaim (for cancellation of Constellation's Arbor Mist mark), on the grounds that

Constellation committed fraud on the PTO.

On January 26, 2007, Constellation filed the subject cross-motion for summary

judgment [#117], seeking a declaration that its Arbor Mist mark does not infringe the Arbor

---

[8]AHA presented evidence that 15 such affidavits were filed during during Fondiller's tenure
leading up to the filing of the subject motions, however, only ten of those Section 15 affidavits pre-date the
filing of the Section 15 affidavit at issue in this case. (Salai Reply Declaration, Exhibit CCC).  Fondiller,
who had been employed by Constellation since 1994, described his responsibilities, in relevant part, as
follows: "I was responsible [for trademark matters]. . . . When the company desires to name a new
product, potential names are submitted to me or to my secretary, and they're referred to outside counsel
for searching and clearance.  Additionally, when we notice names that infringe, in our view, our marks, I'm
the one that instructs outside counsel to act or not as the case may be.  And I am the one that interacts
with outside counsel on normal maintenance matters, whether trademarks to be renewed or allowed to
lapse or whatever may be needed." (Fondiller Deposition pp. 8-9).

[9]This application is made pursuant to FRCP 12(b)(1).

Hill mark, and granting judgment on Count I of its complaint (declaratory judgment of non-infringement), and on AHA's counterclaims, Counts I (Federal Trademark Infringement), II (Violation of § 133 of the New York General Business Law), III (Federal Unfair Competition), IV (Violation of New York Common Law), VII (Intentional Infringement), and VIII (Cancellation of Arbor Mist registration on grounds of fraud).

In opposition to Constellation's motion, AHA contends, *inter alia*, that there has been confusion among consumers since Constellation adopted the Arbor Mist mark, and that Arbor Hill's goodwill among consumers is likely to be damaged since Arbor Mist is an inferior product. (*See,* Amended Answer [#82] ¶ 71).   For example, AHA indicates that numerous customers at the Arbor Hill Grapery have assumed that AHA produced Arbor Mist. (Brahm Affidavit in Opposition to Summary Judgment ¶ 32).   AHA also indicates that it received "a number of phone calls, emails, and letters from confused consumers." (*Id.* at ¶ 36).   AHA states that, as a result of these incidents, it created a "form" which it asked customers to fill out when it  "found that they were confused as to who was making Arbor Mist," and that "[n]early 30 such confused customers signed such forms." (*Id.*).   From the documentation that AHA has submitted, it appears that of the total instances of alleged confusion, four were inquiries by individuals wondering if Arbor Hill produced Arbor Mist, one of the instances involved a mistake by a telephone operator, six of the instances involved people who actually bought Arbor Mist products and thought that it  was produced by Arbor Hill, and 36[10] of the instances involved people who assumed that they could buy Arbor Mist at the Arbor Hill Grapery. (*Id.*, Exhibits W-Y, Exhibits JJ-YY).   Additionally, AHA

---

[10] This total is based on both the pre-printed forms and the separate affidavits from customers submitted by AHA. (*Id.*, Exhibits W-Y, Exhibits JJ-YY).

has identified two instances in which local publications, The Finger Lakes Business Almanac and the Rochester Democrat and Chronicle, mistakenly referred to Arbor Mist as Arbor Hill. (*Id*. at ¶ ¶ 38-39).   However, with regard to the mistake by the Finger Lakes Business Almanac, the Court notes that the mistake was made in a photo caption, while the article itself correctly identified Constellation's product as Arbor Mist. (Salai Declaration in Opposition to Constellation Summary Judgment Motion, Exhibit U).

AHA has also submitted an affidavit from a former employee, Loana J. Shields ("Shields"), who states that during her six years of employment at the Arbor Hill Grapery, beginning in 1999, "at least fifteen to twenty people per week visited the store looking to purchase Arbor Mist products," and that she "received complaints from customers who were dissatisfied with Arbor Mist products and believed that Arbor Hill produced Arbor Mist due to the similarity between the two products names." (*Id*., Exhibit II).   Although issues of credibility cannot be resolved on a summary judgment motion, the Court notes that Shield's affidavit is curious in two respects.   First, although Shields claims that between 1999 and 2005 she encountered at least fifteen to twenty customers per week at the Arbor Hill Grapery who believed that they could purchase Arbor Mist, AHA has only produced proof of 36 such instances, even though it began documenting such instances of confusion, by asking confused customers to sign pre-printed forms, in the Fall of 2000. (Brahm Affidavit in Opposition to Summary Judgment ¶ 36).   However, what is more curious about Shield's affidavit is that on September 22, 2000, Shields herself signed one of AHA's pre-printed forms, indicating that she was confused about the relationship between Arbor Hill and Arbor Mist, approximately one year after she began working at the Arbor Hill Grapery. (*Id*.,

Exhibit Y, Exhibit II).[11]

AHA has also submitted a two-page "pilot survey," conducted by a research firm, purporting to show consumer confusion involving the Arbor Hill and Arbor Mist marks. (*Id.*, Exhibit Z).   The pilot survey was conducted among 52 consumers of "domestic wine, and/or wine coolers and/or fruit flavored wines," in Syracuse, New York, and purportedly shows that between 15.4% and 17.3% of the respondents were "confused into believing either that Arbor Hill came from, was connected with, or received authorization from the makers of Arbor Mist," "based only upon the brand name." (*Id.*).   The surveyor described his methodology as follows:

> To simulate a reverse confusion situation, each respondent was handed a bottle of Arbor Mist and asked to examine it as if he/she 'happened to see it in a store and were thinking  about whether to buy it.'  After the respondent indicated he/she was done, the bottle was removed from view.  At this point, respondents were asked questions regarding their household composition and TV viewing behavior.  Next, using a rotated order across respondents, each respondent was shown an array of 3 bottles of wine bearing the following labels: Arbor Hill, Argent Mist (a fictitious brand designed to serve as a 'control') and Beringer.  At this point, the respondents were asked a series of questions designed to assess confusion as to source, confusion as to association or connection, and confusion as to sponsorship or authorization, and the reasons for their confusion.

(*Id.*)  The survey report does not indicate what questions were asked, nor does it state the respondent's verbatim responses.   The report states that the "pilot survey" or "first phase" survey is not a complete survey, and is intended to be used "as the basis for making a 'go' or 'no go' decision on whether to proceed with a complete survey." (*Id.*, Exhibit AA, p. 4).

---

[11] On September 22, 2000, Shields executed a pre-printed form which states: "To whom it may concern: I stopped at Arbor Hill Winery in Bristol Springs today and asked for Arbor Mist Wines.  I had assumed that Arbor Hill was the producer of Arbor Mist.  Signed: Loana J. Shields." (Brahm Affidavit in Opposition, Exhibit Y).  On February 18, 2006, Loana J. Shields executed an affidavit, stating in relevant part that she became an Arbor Hill employee in December 1999." (*Id.*, Exhibit II).

However, Constellation opposes the introduction of the pilot survey, since AHA declined to produce the survey in discovery on the grounds that it was work product.[12] Alternatively, Constellation contends that the pilot survey "does not have any of the elements of an admissible survey." (Constellation Reply Memo at 13)   Additionally, Constellation maintains that, since 1998, it has sold "hundreds of millions of bottles of Arbor Mist," and has never received any telephone calls or other communications indicating confusion between Arbor Mist and Arbor Hill wine. (Encherman Affidavit ¶ 53).

Counsel for the parties appeared before the undersigned for argument of the motions on May 31, 2007.   Subsequently, the parties made various supplemental submissions.  The Court has now considered all submissions, as well as the arguments of counsel.

ANALYSIS

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).   A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes*

---

[12] Constellation's First Set of Interrogatories, Interrogatory No. 28, asked AHA to "[i]dentify all consumer or marketing surveys or studies conducted by or for AHA, or by or for any other entity affiliated with, related to or sponsored by AHA, concerning Arbor, Arbor Hill, Arbor Mist, Arbor Valley or Arbor Frost, and for each such survey, identify all documents embodying the results of each such survey and all other documents relating to each survey."  AHA's answer to this interrogatory states: "Arbor Hill commissioned a survey during its consideration of whether to commence an action against Constellation.  The survey was conducted by Jacob Jacoby Associates.  AHA has not yet determined whether it will use the survey as evidence in connection with this matter and consequently, until it makes such determination, the results of the survey are work product."  (Kane Supplemental Declaration [#135], Exhibit D).  AHA never supplemented its response to that interrogatory. (*Id*., Exhibit E).

*v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied."  11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

At the outset, the Court will consider the arguments raised in AHA's motion.

<u>AHA's Application to Dismiss Constellation's Declaratory Judgment Claim</u>

As discussed above, AHA maintains that the Court should dismiss Constellation's

declaratory judgment claim, since Constellation "sandbagged" AHA in order to win a race to the courthouse.  Specifically, AHA alleges that, although its counsel and Constellation's counsel had an oral agreement not to commence litigation without giving opposing counsel three-day's notice, Constellation violated that agreement, in order to "intimidate" AHA and "win a race to court."  AHA maintains that Constellation's alleged misconduct in this regard should prompt the Court to dismiss Constellation's declaratory judgment claim.

In support of this argument, AHA cites various cases including *Bausch & Lomb Inc. v. Alcide Corp.*, 684 F.Supp. 1155 (W.D.N.Y. 1987) and *Great Am. Ins. Co. v. Houston Gen. Ins. Co.*, 735 F.Supp. 581 (S.D.N.Y. 1990), which indicate that a district court may decline to exercise jurisdiction over a declaratory judgment action in certain circumstances. *See, Bausch & Lomb Inc. v. Alcide Corp.*, 684 F.Supp. at 1159 ("A declaratory judgment action is an exception to the general rule that a Federal Court must exercise the jurisdiction which is conferred upon it.  The determination of whether or not to exercise jurisdiction is left to the sound discretion of the district court.") (citations omitted).  However, these cases are factually inapposite to the situation here, since they involve attempts by parties to select more convenient forums by filing pre-emptive declaratory judgment lawsuits. *See, e.g., Great Am. Ins. Co. v. Houston Gen. Ins. Co.*,  735 F.Supp. at 586 ("[T]he misuse of the Declaratory Judgment Act to gain a procedural advantage and preempt the forum choice of the plaintiff in the coercive action militates in favor of dismissing the declaratory judgment action.")[13]  In this case, AHA does not claim that it would have brought suit

---

[13] *EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996), another case cited by Arbor Hill, did not involve forum shopping.  Nevertheless, the case is factually inapposite since it involved a party's attempt to apply pressure to another party in connection with ongoing negotiations over the sale and licensing of patents. Id. at 815 ("[T]he district court could properly view the declaratory judgment complaint as a tactical measure filed in order to improve EMC's posture in the ongoing negotiations-not a purpose

against Constellation in a different venue, but rather, it is undisputed that AHA intended to commence its lawsuit here in the Western District of New York.  Nor does AHA claim to be at any procedural disadvantage, apart from arguing that it is "unfair" that Constellation should get to appear before a jury as a plaintiff instead of as a  defendant. (AHA Memo of Law [#116-1] p. 12) (Arguing that Arbor Hill "should be entitled to appear before a jury in the posture of a plaintiff seeking to vindicate its rights, not as a declaratory action defendant."); (Payment Declaration at ¶ 16) ("Constellation's decision to 'get the jump' on its adversary - by filing an action while simultaneously asking me to forebear from filing-served an illegitimate purpose that the Court should not countenance.").

In any event, while AHA may have agreed to give Constellation a three-day notice before commencing a lawsuit, it does not appear that Constellation ever gave a reciprocal assurance.  Moreover, while AHA suggests that it was "sandbagged" by Constellation's commencement of this lawsuit, it does not allege that there was any reasonable likelihood that further negotiations between the parties would have been successful.  On the contrary, AHA's attorneys had indicated that they would likely sue Constellation, once they had discussed the matter with AHA's owners.  Overall, AHA has not presented a compelling argument for declining jurisdiction over Constellation's declaratory judgment claim, and consequently, Arbor Hill's application to dismiss that claim is denied.

### *AHA's application to cancel the Arbor Mist mark on grounds of fraud*

Next, AHA contends that the Court should grant summary judgment on AHA's eighth counterclaim, and cancel the federal registration of Constellation's Arbor Mist mark

---

that the Declaratory Judgment Act was designed to serve.")

pursuant to 15 U.S.C. § 1064, on the grounds that Constellation attempted to defraud the

PTO by submitting a false Section 15 affidavit.  In that regard, generally,

> [a] party seeking cancellation of a registered trademark on grounds of fraud must demonstrate the alleged fraud by clear and convincing evidence. The allegedly fraudulent statements may not be the product of mere error or inadvertence, but must indicate a deliberate attempt to mislead the PTO. Moreover, the knowing misstatement must have been with respect to a material fact-one that would have affected the PTO's action on the applications.

*Orient Exp. Trading Co., Ltd. v. Federated Dept. Stores, Inc.*, 842 F.2d 650, 653 (2d Cir.

1988) (citations and internal quotation marks omitted).  A party seeking such cancellation

faces a "heavy burden," and must "present proof that leaves nothing to speculation,

conjecture, or surmise. Should there be any doubt, it must be resolved against the party

making the claim.   Merely making a false statement is not sufficient to cancel a mark." *De

Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F.Supp.2d 249, 267

(S.D.N.Y. 2006) (citations and internal quotation marks omitted); *see also, Pilates, Inc. v.

Current Concepts, Inc.*, 120 F.Supp.2d 286, 313 (S.D.N.Y. 2000) ("Fraud in a trademark

cancellation is something that must be 'proved to the hilt' with little or no room for

speculation or surmise; considerable room for honest mistake, inadvertence, erroneous

conception of rights, and negligent omission; and any doubts resolved against the charging

party.")(citation omitted).

Moreover, "a court 'must view the evidence presented through the prism of the

substantive evidentiary burden' in determining whether a genuine issue of fact has been

raised sufficient to withstand summary judgment." *Association Ben. Services, Inc. v.

Caremark RX, Inc.*,  493 F.3d 841,854 (7th Cir. 2007) (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. at 254, 106 S.Ct. 2505).  Consequently, the quantum of proof required to prevail on a summary judgment motion is greater where, as here, the fraud claim must be proven by clear and convincing evidence. *See, Id*. (Holding that the plaintiff's contentions were "insufficient to prevent summary judgment on an element of a claim, such as fraud, that ultimately must be proven by clear and convincing evidence."); *see also, Compuware Corp. v. Moody's Investors Servs., Inc.*,  499 F.3d 520, 525 (6th Cir. 2007) ("'When determining if a genuine factual issue as to actual malice exists in a [defamation] suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability,' meaning that the court must grant summary judgment to the defendant 'if the evidence presented ... is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.'") (quoting *Anderson v.Liberty Lobby, Inc.*, 477 U.S. at 254, 106 S.Ct. 2505.); *see also*, 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 31:68 (4th ed.) ("[F]raud in trademark registration procurement, though often alleged, is seldom proven.").

In the instant case, it is undisputed that Baker made an incorrect statement of fact in an affidavit submitted to the PTO.  In that regard, Baker relied upon his own personal knowledge and his assumption that he would have known of any litigation involving the Arbor Mist mark.  AHA has not come forward with any evidence to dispute Baker's explanation of his actions.  Instead, AHA contends that Fondiller acted with fraudulent intent when he directed Baker to file the affidavit, even though Fondiller has stated under oath that he did not recall the specific contents of a combined Section 8 and Section 15 affidavit when he gave that direction.  By way of proof, AHA relies on inferences drawn

from the fact that, during the years leading up to the filing of the subject affidavit, while Fondiller was employed as legal counsel by Constellation, Constellation filed a number of other combined Section 8 and Section 15 affidavits with the PTO in connection with other trademarks.

At the outset, although Constellation contends that the filing of a false Section 15 affidavit cannot provide a basis for cancelling a trademark registration, the weight of case authority, though scant, is to the contrary. *See*, *Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990) ("[F]iling a fraudulent incontestability affidavit provides a basis for canceling the registration itself.") (citing *Crown Wallcovering Corp. v. Wallpapers Mfrs. Ltd.*, 188 U.S.P.Q. 141, 143-44 (1975)); *Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322, 1327 (Fed. Cir. 1999) (The court's analysis indicates that the filing of a fraudulent Section 15 affidavit could warrant cancellation of the trademark); *but see*, 3 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 20:58 (4th ed.) ("Fraud made in a § 15 affidavit to obtain incontestability status would seem not to go to the continuance of the registration itself and hence would not constitute a ground for cancellation of the registration.  Some decisions have held, however, that it does justify cancellation.") (footnotes omitted).  In any event, in this case the Court finds that there are triable issues of fact as to fraudulent intent. Consequently, AHA's motion for summary judgment on its eighth counterclaim is denied.

*AHA's Application for Summary Judgment on Constellation's Second Cause of Action for Infringement of the Arbor Valley trademark*

Constellation's second cause of action alleges that AHA's Arbor Hill mark infringes Constellation's Arbor Valley mark.  Essentially, the claim indicates that if the Arbor Mist mark infringes the Arbor Hill mark, then the Arbor Hill mark must necessarily infringe the

Arbor Valley mark.  However, Constellation clearly does not believe that the Arbor Mist mark infringes the Arbor Hill mark, and this cause of action is merely a fall-back position. Nevertheless, AHA maintains that this claim is barred by the equitable doctrine of laches, since Constellation was aware of AHA's use of the Arbor Hill mark for at least a decade before bringing this action.  The Court agrees that the claim is barred by laches.

The equitable defense of laches applies in cases involving trademark infringement. *See, Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191, 193 (2d Cir. 1996).  To establish the defense, the defendant must show four elements: 1) plaintiff was aware of defendant's use of the mark; 2) plaintiff unreasonably delayed challenging defendant's use of the mark; 3) defendant suffered prejudice as a result of the delay; and 4) defendant has clean hands. *See, Id.* at 192; *see also, Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1040, 1042 (2d Cir. 1980).  Moreover,

> [a]lthough laches is an equitable defense, employed instead of a statutory time-bar, analogous statutes of limitation remain an important determinant in the application of a laches defense. Because the Lanham Act establishes no limitations period for claims alleging unfair competition or false advertising, and because there is no corresponding federal statute of limitations, we look to the most appropriate or the most analogous state statute of limitations for laches purposes.  That statute of limitations then determines which party possesses the burden of proving or rebutting the defense.
>
> ***
>
> [P]rior to the running of the most closely analogous state statute of limitations there is no presumption of laches and the burden remains on the defendant to prove the defense. Alternatively, once the analogous statute has run, a presumption of laches will apply and plaintiff must show why the laches defense ought not be applied in the case.

*Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d at 191(citations and internal quotation marks omitted).  For trademark infringement claims, the analogous state statute of limitations is

New York's six-year fraud statute. *Id.*

In the instant case, Constellation waited far longer than six years before asserting its trademark claim against AHA.  In that regard, AHA has produced evidence indicating that Constellation had to have been aware of AHA's use of the Arbor Hill mark by the late nineteen-eighties or early nineteen-nineties.  As just one example, as mentioned above, Marvin Sands, the President of Constellation's predecessor, Canandaigua Wine Company, acknowledged sampling Arbor Hill wine in 1991.  In opposition, Constellation states only that it has no idea when it became aware of AHA's use of the Arbor Hill mark.  However, "where the question of laches is an issue the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry." *Polaroid Corp. v. Polarad Elecs. Corp.*, 182 F.Supp. 350, 355 (S.D.N.Y. 1960) (*quoting  Johnston v. Standard Mining Co.*, 148 U.S. 360, 13 S.Ct. 585, 37 L.Ed. 480), aff'd, 287 F.2d 492 (2d Cir. 1961).  In short, Constellation either knew, or should have known, that AHA was making and selling Arbor Hill wine, in competition with Constellation's Arbor Valley wine, approximately twelve years before commencing this action.  Consequently, the presumption of laches applies.  The Court further notes, in any event, that AHA suffered prejudice, by continuing to develop and promote its Arbor Hill wines, and that there is no indication that AHA acted in bad faith.

Constellation, however, maintains that laches should not apply, on the somewhat convoluted theory that, if it is determined that the Arbor Mist mark infringes AHA's Arbor Hill mark, such result would constitute a change in the applicable law of trademarks, which in fairness should allow Constellation to claim that the Arbor Hill mark infringes

Constellation's Arbor Valley mark.[14]  Viewed another way, Constellation concedes that, but for a change in the applicable law, its second cause of action is barred by laches.  In support of this argument, Constellation cites *Travelers Ins. Co. v. Cuomo*, 14 F.3d 708, 714 (2d Cir. 1993), *rev'd on other grounds by New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 115 S.Ct. 1671 (1995), *Omega S.A. v. Omega Eng'g, Inc.*, 228 F.Supp.2d 112, 140-41 (D.Conn. 2002), and *Bio-Technology Gen. Corp. v. Genentech, Inc.*  80 F.3d 1553, 1564 (Fed. Cir. 1996), which generally hold that a plaintiff cannot be found to have been dilatory in pursuing its rights when it reasonably believed that it was prevented from doing so, based upon the then-current state of the law. However, the cases cited by Constellation are inapplicable in the instant case, since there has been no change in the relevant law applicable to trademark infringement claims.  To the extent that Constellation alleges that a ruling in AHA's favor, in connection with Constellation's declaratory judgment claim, would necessarily require a change in such applicable law, the Court disagrees.  Consequently, AHA is entitled to summary judgment on Constellation's infringement claim, based on laches.

*Constellation's Application for Summary Judgment on its First Cause of Action Regarding Federal Trademark Infringement*

The Court will now consider Constellation's motion for summary judgment on its first cause of action, which seeks a declaratory judgment that the Arbor Mist mark does not infringe AHA's Arbor Hill mark.  To succeed on a claim for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(a), in general,

---

[14]On this point, Constellation contends that the Arbor Valley mark has priority over the Arbor Hill Mark. On the other hand, AHA insists that the Arbor Hill mark has priority in upstate New York.  However, based upon its rulings herein, the Court need not resolve that issue.

a plaintiff has two obstacles to overcome: the plaintiff must prove that its mark is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark. The bottom line is if no such likelihood of confusion is found, a defendant will generally not be held to have infringed plaintiff's mark.

*Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1074 (2d Cir. 1993).[15]

As for the first prong of this analysis, "[w]hether the mark is entitled to protection depends on whether it is inherently distinctive or, if merely descriptive, has acquired 'secondary meaning." *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 390 (2d Cir. 1995). On this point,

[t]o be valid and protectible, a mark must be capable of distinguishing the products it marks from those of others. There are five different categories of terms with respect to the protection of a mark: generic, descriptive, suggestive, arbitrary, and fanciful. The categories reflect both the eligibility for protection and the degree of protection accorded. A mark is generic if it is a common description of products and refers to the genus of which the particular product is a species. A mark is descriptive if it describes the product's features, qualities, or ingredients in ordinary language or describes the use to which the product is put. A mark is suggestive if it merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods. An arbitrary mark applies a common word in an unfamiliar way. A fanciful mark is not a real word at all, but is invented for its use as a mark.

The five categories focus the inquiry on the distinctiveness of the mark. Fanciful, arbitrary, and suggestive marks are deemed inherently distinctive. Their intrinsic nature serves to identify a particular source of a product, so they will be automatically protected. Marks which are descriptive are not inherently distinctive, and a showing that the mark has acquired distinctiveness-"secondary meaning"-is required before protection will be extended. Generic marks are not protectible.

*Lane Capital Management, Inc. v. Lane Capital Management, Inc.*, 192 F.3d 337, 344 (2d

---

[15]The precise elements of a claim for trademark infringement under the Lanham Act are as follows: "Under § 1114 of the Lanham Act, plaintiff in a trademark infringement action must show that defendant (1) without consent, (2) used in commerce, (3) a reproduction, copy or colorable imitation of plaintiff's registered mark, as part of the sale or distribution of goods or services, and (4) that such a use is likely to cause confusion." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d at 1075.

Cir. 1999) (citations omitted).  Here, the Court finds that the Arbor Hill mark is arbitrary, and

is therefore entitled to protection.[16]

The second prong of the two-prong analysis described above is whether there is a

likelihood of confusion between the Arbor Mist mark and the Arbor Hill mark.  To establish

"likelihood of confusion," the party alleging infringement must prove

> that numerous ordinary prudent purchasers are likely to be misled or
> confused as to the source of the product in question because of the entrance
> in the marketplace of defendant's mark.  For a finding of infringement a
> probability of confusion, not a mere possibility, must be found to exist.
>
> The factors ordinarily weighed in determining the likelihood of confusion are
> the familiar *Polaroid* factors, which include: 1) the strength of the plaintiff's
> mark;[[17]] 2) the similarity of plaintiff's and defendant's marks; 3) the
> competitive proximity of the products; 4) the likelihood that plaintiff will
> "bridge the gap" and offer a product like defendant's; 5) actual confusion
> between products; 6) good faith on the defendant's part; 7) the quality of
> defendant's product; and 8) the sophistication of buyers. The *Polaroid* factors
> are not dispositive, and additional factors may be considered or initial factors
> abandoned.

*Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d at 1077 (referring to *Polaroid Corp.*

*v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct.

36, 7 L.Ed.2d 25 (1961)) (citations omitted); *see also*, *Star Indus., Inc. v. Bacardi & Co.*

*Ltd.*, 412 F.3d 373, 383 (2d Cir. 2005) ("Likelihood of confusion includes confusion of any

kind, including confusion as to source, sponsorship, affiliation, connection, or identification.

In order to be confused, a consumer need not believe that the owner of the mark actually

---

[16] Although the word "arbor" is the only term in common between the parties' marks, "the Court must analyze [the Plaintiff's] mark as a composite when determining whether it qualifies for trademark protection." *Nabisco v. Warner-Lambert Co.*, 32 F.Supp.2d 690, 696-97 (S.D.N.Y. 1999), *aff'd* 220 F.3d 43 (2d Cir. 2000).

[17] "The central consideration in assessing a mark's protectability, namely its degree of distinctiveness, is also a factor in determining likelihood of confusion." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006).

produced the item and placed it on the market.  The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.") (citations omitted).

<u>Strength of the Arbor Hill mark</u>

The Court has determined that the Arbor Hill mark is arbitrary, and arbitrary marks are generally considered to be strong. *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d at 385 ("Among marks relying solely on inherent distinctiveness for their protectability, arbitrary or fanciful ones are the strongest.").  However, "[o]nce a mark has been classified, the second step in determining strength is to consider its degree of distinctiveness, an inquiry that concerns both the inherent inventiveness of the mark itself and the amount of third-party usage of the term as a mark, especially in the market in question." *Id*. at 385; *see also, Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 479 (2d Cir. 1996) (Holding that, in determining the strength of a mark, "consideration of the recognition that the mark actually enjoys in the marketplace is not error," and may "cast doubt on the otherwise firm conclusion that [a mark] is strong.") (citation omitted).  Here,  there is extensive third-party use of the word "arbor" in the wine industry, which detracts from the strength of the Arbor Hill mark. *See, W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567,573 (2d Cir. 1993) ("[E]xtensive third party use of the words sport and stick weighs against a finding that WWW's trade name is strong.") (citation and internal quotation marks omitted), *limited on other grounds by Deere & Co. v. MTD Products, Inc.*, 41 F.3d 39, 63 USLW 2349, 32 U.S.P.Q.2d 1936 (2nd Cir. 1994).  Moreover, the fact that AHA has had only modest, regional success with Arbor Hill wine also detracts from the strength of the mark. *Id*.

("WWW has had only very modest sales since it entered the business . . . .  This evidence indicates a low national recognition of WWW's product.") (citation omitted).  Consequently, the Court finds that the Arbor Hill mark is "deserving of trademark protection, but not entitled to the fullest protection available under the law." *Id*. (*quoting  W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 808 F.Supp. 1013, 1023 (S.D.N.Y. 1992)).

<u>Similarity of the marks</u>

With regard to the second *Polaroid* factor, "[i]n assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d at 386; *see also, W.W.W. Pharm. Co., Inc. v. Gillette Co., Inc.*, 984 F.2d at 573 (Holding that, in assessing the similarity of the marks, a court should "look at the general impression created by the marks, keeping in mind all factors which the buying public will likely perceive and remember.") (citation omitted).  "The similarity of the marks is a key factor in determining likelihood of confusion." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006) (citation omitted).

In the instant case, the marks are "marginally similar" in that they both contain the word "arbor." *See, Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d at 46 ("Dentyne Ice and Ice Breakers are at best marginally similar because of the common use of 'Ice.'").  Additionally, both wines are sold in bottles that are roughly the same size and shape, which is basically the same size and shape of most wine bottles.  However, apart from those facts, there is very little similarity between the appearance of the marks and products. (*See*, Exhibit A attached hereto.)  Although both marks contain the word "arbor," they do

not sound the same.   Nor do the names produce the same effect, since "Arbor Hill" suggests a geographic location or place, *i.e.*, a particular hill,  while "Arbor Mist," used in connection with wine, more generally suggests a connection to a grape arbor and/or vines. The marks use different typefaces and styles, with the Arbor Hill name appearing in black lettering on a white paper label, while the Arbor Mist name appears in stylized white lettering on a distinctive, clear plastic label.   Additionally, Arbor Hill labels bear the name of the particular type of wine, *e.g.*, "Riesling," while Arbor Mist labels bear the names of various combinations of fruit juice and wine, such as "Strawberry White Zinfandel."  Arbor Hill labels bear the image of a tree, while Arbor Mist labels have pictures of various fruits. Arbor Hill labels indicate that the wine is from the "Finger Lakes," while Arbor Mist labels have no such geographic designation.  The Arbor Hill bottle is a traditional-looking, dark-green wine bottle, with a gold foil wrapper on the neck of the bottle, while the Arbor Mist bottle is a more distinctive, clear-frosted glass bottle, with a black foil wrapper on the bottle neck.  Bottles of Arbor Mist are also unlike bottles of Arbor Hill wine in that each variety of Arbor Mist has a distinctive color, which is visible through the clear frosted bottle.  Finally, the Arbor Hill bottle appears to be sealed with a cork, while the Arbor Mist bottle appears to have a screw-off cap.

        In short, the two products create very different impressions. *See, Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d at 47 ("The cumulative effect of the differences between the parties' products and in the commercial presentation of their marks creates distinct marketplace impressions.") Moreover, these differences, which are so obvious when viewing the products side by side, are sufficiently memorable to dispel confusion among

consumers who may be viewing the products serially. *See, Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 538 (2d Cir. 2005) ("Whether simultaneous viewing by consumers is likely to result in confusion is not relevant when it is serial viewing that is at issue given the market context or the type of confusion claimed. In such a case, a district court must ask not whether differences are easily discernable on simultaneous viewing, but whether they are likely to be memorable enough to dispel confusion on serial viewing.")  Consequently, the Court finds that this factor weighs heavily in Constellation's favor.

*Competitive proximity of the products*

With regard to the third *Polaroid* factor,

> [t]he 'proximity-of-the-products' inquiry concerns whether and to what extent the two products compete with each other.  We look to the nature of the products themselves and the structure of the relevant market.  Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold.

*Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d at 480 (citations omitted).  In the instant case, the products are both alcoholic beverages, which are sometimes sold through the same channels of trade, such as liquor stores, although unlike Arbor Hill, Arbor Mist is also sold in supermarkets and mass-merchandise stores.  Although Arbor Mist is less expensive than Arbor Hill, that does not negate the fact that they compete with each other. *Star Indus., Inc. v. Barcardi & Co., Ltd.*, 412 F.3d at 387 ("That Georgi vodka costs half as much as Bacardi rum and is displayed on different shelves in the same store does not imply that the products are not in competition.").  However, the nature of the two products is clearly different, since Arbor Hill is traditional table wine, while Arbor Mist is a mix of wine and fruit

juice, with a lower alcohol content than most wine. (*See, e.g.*, Payment Declaration at ¶ 2) (AHA's counsel refers to Arbor Mist as a "wine cooler beverage product.").  In fact, one of AHA's counterclaims in this action accuses Constellation of engaging in  false advertising by calling its Arbor Mist products "wine," since they "are not wines." (AHA Amended Answer and Counterclaims, ¶ 99).   Additionally, the products differ greatly as to "geographic distribution" and "market position," with Arbor Hill wine having modest regional sales and Arbor Mist having sales of millions of bottles nationwide. *See, WWW Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d at 573.   Consequently, although the products compete with each other, this factor does not overwhelmingly favor AHA. *Star Indus., Inc. v. Barcardi & Co., Ltd.*, 412 F.3d at 387 ("Appellees are correct to point out that vodka, rum, and malt beverages do reside in distinct submarkets of the market for alcoholic beverages.  Vodka and rum, while sold in the same stores to the same consumers for similar purposes, are distinct varieties of product; and this is more so with malt beverages . . . which contain a much smaller concentration of alcohol.   Our finding of competitive proximity is thus tempered, and the factor does not overwhelmingly favor Star.").

### *Bridging the gap*

This fourth *Polaroid* factor "refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d at 387.  In this case, there is no gap to bridge, since the parties already compete in the same market.  This is true even though one party sells table wine and the other produces a wine fruit juice beverage. *See, Id.* (Finding no bridge to gap, despite the fact that one party produced rum and malt

beverages and the other produced vodka).  Therefore, this factor is irrelevant to the Court's *Polaroid* analysis. *Id*. ("Because, as we have held above, Star's and appellee's products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis in this case.") (citations omitted).

<u>Actual consumer confusion</u>

When considering actual consumer confusion, the question is whether consumers will think that Arbor Mist comes from the same source as Arbor Hill wine. *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 166 (2d Cir. 2004) ("The question is whether consumers will think that "Quilted Northern Moist-Ones" come from the same *source* as "Wet Ones" products.") (emphasis added, citations omitted).  When balancing the *Polaroid* factors, evidence of actual consumer confusion is particularly relevant. *See, Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003) ("It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion.  We have therefore deemed evidence of actual confusion 'particularly relevant' to the inquiry.") (citation omitted).

In the instant case, AHA has presented evidence regarding actual instances of consumer confusion, as well as survey evidence.  With regard to the survey evidence, AHA states that its "professional market survey" "confirm[s] that there [is] a significant tendency for consumers to be confused by the similarity between Arbor Mist and Arbor Hill; a sizeable percentage of consumers surveyed assumed that the two products were produced by the same company." (AHA Memo of Law in Opposition at 14).  However, the Court declines to consider the pilot survey, since AHA did not produce it in discovery. *See*, FRCP

37(c)(1); *see also, Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F.Supp.2d 355, 376

(S.D.N.Y. 2003) ("This Court declines to consider any survey or expert report, including the

Pilot Survey, offered to defendants for the first time on a summary judgment motion and

inexplicably not produced during discovery.").   Even if AHA had produced the survey

summary during discovery, the Court would exclude it in any event, since it does not satisfy

the criteria for admissibility.   In that regard,

> [s]urvey evidence is generally admissible in cases alleging trademark
> infringement under the Lanham Act.   To assess the admissibility of survey
> evidence, the court should consider a number of criteria, including whether:
> (1) the proper universe was examined and the representative sample was
> drawn from that universe; (2) the survey's methodology and execution were
> in accordance with generally accepted standards of objective procedure and
> statistics in the field of such surveys; (3) the questions were leading or
> suggestive; (4) the data gathered were accurately reported; and (5) persons
> conducting the survey were recognized experts.   A trademark survey must
> also approximate marketplace conditions.     While errors in survey
> methodology usually go to weight of the evidence, a survey should be
> excluded under Rule 403, Fed.R.Evid., when its probative value is
> substantially outweighed by its prejudicial effect or potential to mislead the
> jury.   Thus, a survey should be excluded under Rule 403 when it is so flawed
> in its methodology that the survey proves little and the jury is very likely to be
> misled.   While courts in the Second Circuit rely mainly on Rule 403 to
> exclude unreliable surveys, we note that Rule 702 is clearly applicable as
> well, because the result of a survey is essentially expert testimony, and Rule
> 702 requires that such testimony must be reliable. The bottom line is that if
> the survey suffers from substantial methodological flaws, it will be excluded
> under both Rule 403 and Rule 702.

*Malletier v. Dooney & Bourke, Inc.*, 525 F.Supp.2d 558, 580 -581 (S.D.N.Y. 2007)

(citations, internal quotation marks and footnote omitted).   "The necessary foundation will

normally be laid through the testimony of the persons responsible for the various parts of

the survey." *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F.Supp. 1189, 1205

(S.D.N.Y. 1983) (citations omitted).

Here, AHA's "survey" is a two-page summary of a pilot survey involving 52 consumers of alcoholic beverages who were shown a bottle of Arbor Mist, and then sometime later, shown three other bottles of wine "bearing the following labels: Arbor Hill, Argent Mist (a fictitious brand designed to serve as a 'control'), and Behringer." (Brahm Affidavit, Exhibit Z).[18]   The summary indicates that

> *based only upon the brand name*, 17.3% of the 52 respondents definitely were confused into believing either that Arbor Hill came from, was connected with, or received authorization from the makers of Arbor Mist.   The corresponding percentage for the control brand (Argent Mist) was only 1.9%. Thus, after subtracting for 'noise,' our best empirically derived estimate of likely reverse confusion is (17.3-1.9=) 15.4%.

(*Id.*) (Emphasis added).  The summary does not include photographs of the actual bottles used.  Moreover, although the summary states that the consumers "were asked a series of questions designed to assess confusion as to source, confusion as to association or connection, and confusion as to sponsorship or authorization, and the reasons for their confusion," it does not provide the actual questions asked or answers given. (*Id.*). Consequently, the Court cannot determine if the summary evidence is reliable.  Moreover, it has been held that surveys such as AHA's have little probative value where they show only that a certain number of consumers will assume that some type of relationship exists between two companies with similar names. *Beneficial Corp. v. Beneficial Capital Corp.*, 529 F.Supp. 445, 451 (S.D.N.Y. 1982) ("The survey establishes no more than that the names are similar, a factor as to which there can be little genuine dispute in any event, and that portions of the general public will make the reasonable assumption, that, in the absence of any other information, two companies with similar names are likely to have a

_____

[18] AHA did not submit an affidavit from the individual(s) who conducted the pilot survey.

business connection.  However, this proposition provides no indication of public reaction under actual market conditions.").

AHA's remaining evidence of actual confusion consists of anecdotal and documentary evidence.  For example, AHA has received phone calls and letters regarding Arbor Mist from consumers, and has documented other incidents involving visitors to the Arbor Hill Grapery who expressed an interest in purchasing Arbor Mist.  Overall, it appears that six instances involved actual purchasers of Arbor Mist, and as many as 6240 instances, over a six-year period, involved people who stopped at the Arbor Hill Grapery assuming that they could buy Arbor Mist.[19]  It appears that most, if not all, of these persons assumed that there was a connection between the products, based solely on the similarity of the names.  On the other hand, Constellation maintains that it has not encountered any instances of consumer confusion.

Viewing the evidence in the light most-favorable to AHA, this factor favors AHA.  See, Lon Tai Shing Co., Ltd. v. Koch+Lowy, No. 90 Civ. 4464 (DNE), 1991 WL 170734 at *11 (S.D.N.Y. Jun. 20, 1991) (Holding that a plaintiff may use "confusion by only a small percentage of buyers" to establish actual confusion.); see also, Virgin Enters. Ltd. v. Nawab, 335 F.3d at 151 (Holding that, where "Plaintiff submitted to the district court an affidavit of a former employee of defendant Cel-Net, who worked at a mall kiosk branded as Virgin Wireless, which stated that individuals used to ask him if the kiosk was affiliated with plaintiff's VIRGIN stores," "[t]he district court correctly concluded that this evidence

---

[19]The figure of 6240 consumers is based on the affidavit of AHA employee Loana J. Shields, who, as mentioned earlier, indicated that over a period of six years, or 312 weeks, approximately 15 to 20 people per week stopped at the Arbor Hill Grapery looking to purchase Arbor Mist.  The Court has used the higher figure of 20 people per week.

weighed in plaintiff's favor" with regard to the "actual confusion" *Polaroid* factor.).

### *Good faith*

The sixth *Polaroid* factor asks "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d at 575. In that regard, "[g]ood faith can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search or has relied on the advice of counsel." *Id.* Mere knowledge of the senior user's similar mark does not necessarily establish bad faith. *Id.*; *see also, Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d at 388 ("[I]n some cases even where a trademark search resulted in knowledge of the earlier mark, in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, this Court has found the junior user to be in good faith.") (citations omitted).

Here, AHA concedes that Constellation was not attempting to benefit from Arbor Hill's goodwill when it selected the Arbor Mist name. (Brahm Reply Affidavit, ¶ 63) ("[G]iven that Constellation intended to market Arbor Mist nationally, it is apparent that Constellation could not have expected that the goodwill associated with Arbor Hill in western New York, would help Constellation sell bottles of Arbor Mist elsewhere in the country."). Nevertheless, AHA insists that Constellation acted in bad faith, since it was aware of the Arbor Hill mark when it selected the Arbor Mist mark. However, it is undisputed that neither Encherman nor Vlosky was aware of Arbor Hill when they selected the name Arbor Mist. *See*, *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d at 389 (Finding no evidence of bad

faith, where certain "regional vice presidents" of defendant's company were aware of plaintiff's mark, but individuals who actually selected defendant's mark were not.).  To the contrary, Encherman and Vlosky selected the word "arbor" because of its association with wine, and the word "mist" because it went well with the product's frosted bottle and suggested "refreshment."  AHA denies that the word "arbor" is *necessarily* connected with wine, and the Court agrees.  However, it is also clear that, to a certain extent, the word "arbor" is suggestive of grapes and wine in the same way that the word "orchard" is suggestive of apples.  Consequently, the name Arbor Mist reflects the product's characteristics.  Finally, Constellation had already been using the word "arbor" as part of its Arbor Valley trademark for over a decade.  Overall, Constellation's prior knowledge of the Arbor Hill mark does not indicate bad faith.

AHA also contends that Constellation acted in bad faith by "fail[ing] to seek a legal opinion as to whether Arbor Mist would infringe the Arbor Hill mark." (AHA Memo of Law p. 17).  However, it is again undisputed that Constellation conducted a trademark search for the name "Arbor Mist."  The fact that Constellation did not obtain a specific opinion concerning the Arbor Hill mark does not indicate bad faith. *See, Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d at 388 ("[I]n some cases even where a trademark search resulted in knowledge of the earlier mark, in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, this Court has found the junior user to be in good faith."); *see also, Juicy ZCouture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ.7203(DLC), 2006 WL 1012939 at *28 (S.D.N.Y. Apr. 19, 2006) ("Failure to perform a trademark search, standing alone, does not prove bad faith, even where a defendant is

aware of other products using similar names.") Therefore, the Court finds that this *Polaroid* factor favors Constellation.

<u>Quality of the defendant's product</u>

This seventh *Polaroid* factor "considers whether the senior user's reputation could be tarnished by the inferior merchandise of the junior user." *Cadbury Beverages, Inc. v. Cott Corp.*, 75 F.3d at 483 (citations and internal quotation marks omitted). "Generally, quality is weighed as a factor when there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d at 1079 (citation omitted). The fact that the junior user's product is cheaper does not necessarily indicate poor quality. *Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d at 389. On the other hand, "a very marked difference in quality between the two products would militate against finding a likelihood of confusion as consumers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user." *Id.* (citation and internal quotation marks omitted). However, similar to the issue of bad faith, this factor is not "of high relevance to the issue of likelihood of confusion." *Virgin Enterprises Ltd. v. Nawab*, 335 F.3d at 151. Instead, "[t]he issue of the quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion." *Id.* at 152.

In this case, AHA maintains that Arbor Mist is a "clearly inferior" product that is viewed with disdain by the wine making community. (AHA Memo of Law in Opposition at 22). As discussed above, AHA's contention in this regard, if proven, might actually "militate

against finding a likelihood of confusion." *Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d at 389.   However, although AHA has produced some hearsay evidence that a few consumers did not like Arbor Mist, it has not produced proof that Arbor Mist is an inferior-quality product. *See, Jaret Intern., Inc. v. Promotion in Motion, Inc.*, 826 F.Supp. 69, 77 (E.D.N.Y. 1993) ("The parties make self-serving assertions about the quality of their candies but no expert opinion or empirical evidence was offered on this issue.").   Instead, the record indicates only that, compared to AHA's wines, Arbor Mist is a sweeter, lower-alcohol drink that appeals to a different segment of consumers.   Consequently, the Court finds that this factor favors Constellation.

### Sophistication of the purchasers

The eighth and final *Polaroid* factor "recognizes that the likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." *Cadbury Beverages, Inc. v. Cott Corp.*, 75 F.3d at 480 (citations and internal quotation marks omitted).   On this point, a court

> considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.   Consumer sophistication may be proved by direct evidence such as expert opinions or surveys. In addition, in some cases a court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price.

*Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d at 390 (citations and internal quotation marks omitted).   Courts have found that consumers generally use less care when purchasing inexpensive products, and more care when purchasing expensive items. *See, W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d at 575 ("Generally, purchasers of small

41

items like lip balm are considered casual purchasers prone to impulse buying."); *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d at 390 (citations omitted) ("Liquor stores, which sell a limited variety of products, are not as cluttered and frantic as . . . supermarkets . . . . In comparison with the items available at such supermarkets, $24 bottles of liquor are relatively expensive. . . .  Unhurried consumers in the relaxed environment of the liquor store, making decisions about $12 to $24 purchases, may be expected to exhibit sufficient sophistication to distinguish between Star's and Bacardi's products, which are differently labeled.").

In the instant case, neither party has presented any direct evidence of consumer sophistication.  At most, the record indicates that Arbor Hill wines range in price from $7 to $12 per bottle, while Arbor Mist is priced at $3 to $4 per bottle. (Smith Declaration Exhibit 7, Encherman Affidavit ¶ 51).  Additionally, the record indicates that Arbor Hill wine is sold in wine shops, liquor stores, and restaurants, while Arbor Mist is sold in "liquor stores, supermarkets, and mass merchandisers." (Encherman Affidavit ¶ 52).  From these facts, it is possible that purchasers of Arbor Hill's products would tend to be more sophisticated and unhurried than purchasers of Arbor Mist.  However, neither product is particularly expensive, and consumers of both products might therefore be presumed to be unsophisticated under the *Polaroid* analysis.  Consequently, although the Court does not believe that it takes a high level of sophistication to distinguish between the two products, this factor favors AHA.

### Balancing the Polaroid factors

The legal principles applicable to this final step of the *Polaroid* analysis are well

42

settled:

> Where the predicate facts are beyond dispute, the proper balancing of these [*Polaroid*] factors is considered a question of law.  When balancing the factors, district courts generally should not treat any single factor as dispositive; nor should a court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins.  Instead, the court should focus on the ultimate question of whether consumers are likely to be confused.

*Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d at 162 (citations and quotation marks omitted).  As already mentioned, in this regard,  the party alleging infringement must prove "that numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question because of the entrance in the marketplace of defendant's mark.  For a finding of infringement a probability of confusion, not a mere possibility, must be found to exist." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d at 1077.

Balancing all of the *Polaroid* factors, the Court cannot grant summary judgment.  To summarize the findings above, four of the factors favor AHA, namely, strength of the mark, competitive proximity, actual confusion, and sophistication of buyers.  On the other hand, three of the *Polaroid* factors weigh in Constellation's favor, namely, similarity of the marks, good faith, and quality of defendant's product.  The fourth *Polaroid* factor, bridging the gap, is irrelevant here, since the parties already compete.[20]  However, the Court finds that there are triable issues of fact as to actual confusion, which preclude summary judgment.  Consequently, Constellation's summary judgment motion is denied.

CONCLUSION

---

[20]In any event, AHA has not shown that it intends to enter the market for wine and fruit juice beverages, nor has it shown that consumers would reasonably expect it to do so.

For all of the foregoing reasons, AHA's motion for summary judgment is granted as to Constellation's Second Cause of Action for infringement, and is otherwise denied. Constellation's summary judgment motion is denied in its entirety.

Dated:      Rochester, New York
            February 26, 2008

                              ENTER:


                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge